IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br><br>v.<br><br>**THOMAS FARMER,**<br>Defendant. | Criminal Case No.  3:13-cr-00162-DRD |

### DEFENDANT MOTION TO COMPEL COMPLIANCE WITH *BRADY*

The Government has failed to meet its constitutional obligation to search for, and then to disclose exculpatory material to the Defendant Thomas Farmer under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny (hereinafter "*Brady*").[1] The Government has ignored Defendant's specific *Brady* requests, has instead tendered more than 16 million pages of data, and now claims that it has satisfied its *Brady* obligations. Further, the Government has repeatedly declined to confirm the sufficiency of its production of *Giglio* material on the ground that it has not chosen its trial witnesses.[2]

---

[1] *See, e.g.*, *Drumgold v. Callahan*, 707 F.3d 28, 38(1st Cir. 2013) (tracing precedential origins of constitutional disclosure principles now generally known as *Brady*).

[2] *See, e.g.*, Snyder letter dated June 5, 2013, at p. 8. Current counsel for the prosecution reaffirmed in 2014 that this remains the position of the Government, and they also declined defense counsel's requests for the identity of the Government's witnesses.

The complete inadequacy of this *Brady* response has been confirmed by: (i) the Government's production as a trial exhibit last week of a highly exculpatory document from its chief witness Gregory Glova; and (ii) a Government press release (Exhibit 1) in March announcing that the Government has declined to pursue a qui tam lawsuit against Crowley filed by its sole "confidential informant," William Stallings. The Government disclosed neither matter to defendant pursuant to its *Brady* obligations last year, when such disclosure was sought and warranted. Instead, the Government incorrectly claims that its "open file" discovery production of more than 16 million documents satisfies its *Brady* obligations without any need for it to review or to produce exculpatory documents or information. In addition, the Government has refused specific requests for exculpatory information, and should be compelled to do so.

Rather than comply with its *Brady* obligations in this case, the Government has sought to bury them under a mound of documents. That is not compliance with *Brady*, and this Court should order the Government to comply with its *Brady* obligations. Specifically, Defendant Farmer asks this Court to order the Government to produce the following:

(a) To search for, and to produce, documents responsive to Defendant's two sets of specific *Brady* requests (Exhibits 2 & 3);

(b) To search for, and to produce, documents related to its qui tam action, including all documents relating to the Government decision to decline to pursue the qui tam action against Crowley;

(c) To produce the Guideline computations provided to its cooperating witnesses in order to induce their cooperation;

(d) To produce the list of individuals targeted by the FBI for consensual recorded telephone calls by its chief witness Gregory Glova; and

(e) To produce the interview notes containing admitted *Brady* material.

Each type of *Brady* relief is justified.

**Background**

This is a criminal antitrust prosecution of Mr. Farmer, a former employee of the barge company Crowley Maritime. The Indictment does not specify any particular act of Mr. Farmer (or anyone else), and instead simply characterizes the conspiracy as one involving price-fixing, market allocation, and bid-rigging. During the *Peake* trial of January 2013, however, the Government made clear, through the testimony of its cooperating witnesses, that the alleged conspiracy involved a 50/50 market allocation conspiracy between the two vessel companies Horizon and Sea Star, using artificial vessel rates in order to steer vessel customers between the two vessel companies, and induce them to accept higher vessel rates.

As fundamental economics and simple deductive logic reveals, if the two vessel companies were locked in a multi-year conspiracy in which they could *not* compete against each other on cargo rates or volume, the only remaining potential *target* for obtaining cargo would be the two remaining barge companies (Crowley and Trailerbridge). This necessarily placed the vessel companies (individually and together as co-conspirators) in a position adverse to the barge companies, and they deployed the considerable advantages of the conspiracy to target the barges. Indeed, the self-proclaimed head of the 50-50 conspiracy at Horizon, Gabriel Serra, would instruct his new subordinate Gregory Glova in 2006 to take business from the barge companies,

and not from Sea Star. Exhibit 4 ("[O]ur biggest upside should be focused on getting TRBR and CRMT freight. *With SSL, we'll mostly be trading horses."*) (emphasis added).

Finally, because the two barge companies competed against each other using lower barge rates, neither barge company could raise its prices above barge rates without incurring the risk of losing barge cargo to the other barge company charging low barge rates. Indeed, because Trailerbridge offers the same barge service as Crowley, at competitive barge rates, marketed to the same category of barge customers, the absence of Trailerbridge from the conspiracy conjured by the Government makes it infeasible. The Government's conspiracy claim implausibly portrays collusion between the higher rates of the vessel companies and the lower rates of the barge companies. This would be economic suicide on behalf of Crowley because vessel rates and cargo are to barge rates and cargo what apples are to oranges.

Since the indictment has the same language used in the Peake Indictment, Mr. Farmer has repeatedly made it clear that neither he nor Crowley could have participated in the 50/50 vessel conspiracy, and that they were, if anything, barge victims of that vessel conspiracy. To this day, the Government has declined multiple requests to explain how Farmer could logically or practically be a member of the 50/50 vessel conspiracy. Instead, the Government has claimed that this defense is sufficiently unsubstantiated, "ludicrous[],"and misleading that this Court should decline to transfer this case to the home district of Mr. Farmer because the Jacksonville federal judges would be more susceptible to being misled by it. Govt't Mem., at 9 (Docket No. 38) ("A judge unfamiliar with the actual evidence might be misled by such arguments or waste valuable time and resources to determine their fallacy.").

In 2013, Defendant Farmer propounded two sets of *Brady* requests upon the Government. Exhibits 2 & 3. Among other things, these *Brady* requests seek evidence to support Farmer's announced defense that the 50-50 conspirators were actually targeting Crowley and Trailerbridge, notwithstanding the Government's representations to this Court that this defense is "ludicrous" and without evidentiary support. The Government responded to defendants' *Brady* requests by taking the position that producing open file discovery of some 16 million plus pages of discovery satisfied their *Brady* obligations. Separate and apart from this document production, the Government sent the defense a *Brady* letter detailing what it considers exculpatory omissions in certain witness interview reports (302s) based upon its review of its agent's notes of these interviews.

As the Court is aware, Defendant Farmer filed a bill of particulars motion in January 2014 asking the Government to clarify the nature of the conspiracy charged, including whether Trailerbridge is a member, the nature of the conspiratorial transactions, and whether Farmer is alleged to be a participant in the 50/50 vessel conspiracy. In response, the Government identified three companies as conspiracy members but did not include Trailerbridge, identified only bunker fuel surcharges as the transactions involved, and contended that Farmer was part of the 50-50 vessel conspiracy. When Farmer sought clarification by filing a second bill of particulars, the Government reversed its prior position, refusing to exclude Trailerbridge from the conspiracy, and claiming that bunker fuel surcharges was but one of an unidentified number of "components" of the conspiracy.

In January 2014, Defendant Farmer also moved this Court to compel the Government to produce its trial exhibits ninety (90) days before the scheduled trial date. Docket No. 57. The justification for this motion was similar to that animating the bill of particulars—simply

providing open file discovery of 16 million pages of documents addressing thousands of transactions by numerous companies over an eight year period is no way to give notice of the evidence that the defendant must confront at the upcoming trial. The Government opposed this relief, as well as motion for a second bill of particulars motions.

At a hearing on March 25, 2014, this Court granted the Defendant's motion to compel the production of government trial exhibits, and ordered the Government to do so by Friday, March 28, 2014 (and indeed, the Government announced at the hearing for the first time that it was willing and able to do so). On March 28th, however, the Government tendered to the defense only a "preliminary list" of government trial exhibits.

Among the Government's trial exhibits, however, is Government Ex. 63, a single page from the thousands of pages of journal entries of a key government witness by the name of Gregory Glova. *See* Exhibit 5 (GE 63). This journal entry is entitled "Week of August 13th," and it appears to be a memorialization of a meeting held by Mr. Glova (the Director of Horizon's Puerto Rico Tradelane) with his staff in mid-August 2007.

Critically, in the right hand column, Glova indicates that he has instructed all three of his direct pricing analyst reports (Tony Lorenzo (TL), Adrian Conti (AC), and Karen Haines (KC)) to focus on "CMT Targets" and "TRLB Targets." Exhibit 5.

This document is highly exculpatory in at least four independent ways:

- First, it unequivocally shows that the Government's key witness (Mr. Glova) was instructing his staff to target Crowley and Trailerbridge, which contradicts his later claim made on behalf of the Government that he had instead been colluding

6

with Crowley through Mr. Farmer.[3] *See Conley v. United States*, 415 F.3d 183, 190 (1st Cir. 2005) (evolution of witness story constitutes *Brady*) (citing *Kyles v. Whitley*, 514 U.S. 419, 444 (1995)).

- Second, it demonstrates that Glova was simultaneously targeting both barge cargo, without any similar instructions to his staff to target Sea Star cargo.

- Third, by targeting Trailerbridge, as well as Crowley, Glova was targeting barge rates which would affect both barge companies.

- Finally, Glova's instructions to his senior staff in mid-August 2007 to target Crowley cargo is also exculpatory for statute of limitations purposes. The applicable limitations period in this case, based off of the March 21, 2013 Indictment, is March 21, 2008.[4] GE 63 demonstrates that the Government's key witness was actively targeting Crowley cargo at least five years and seven months prior to the Indictment.

The Government, however, did not produce this document in response to Defendant Farmer's *Brady* requests of 2013; instead it was buried among the 16 million pages of discovery produced by the Government. Further, the exculpatory nature of this document is even more obvious when the Court considers that the Government represented to this Court in opposing a transfer in 2013 that it was "ludicrous" for Farmer to contend that Crowley was the target of the

---

[3] Nor can there be any claim that Mr. Glova was deceiving his staff in this regard. When Mr. Glova was forced to share his breakfast with FBI agents on the day of the raid (April 17, 2008), he made consensual calls to two of these pricing subordinates (one was not in the office) to ensnare them into admitting they were part of the 50-50 conspiracy which he had ordered them to perform.

[4] The Government bears the burden of proving that its case is brought within the statute of limitations. *United States v. Duhamel*, 770 F.Supp.2d 414,416 (D. Maine 2011) (citing *United States v. Ferris*, 807 F.2d 269, 272 (1st Cir. 1986)).

50-50 vessel conspiracy, notwithstanding the Government's continuous possession of GE 63 since the day of the April 17, 2008 search.

March, 2014 also brought other previously undisclosed *Brady* information to the fore. In March 2014, the Government issued a press release announcing that it had assumed and settled a qui tam action brought by its confidential information, William Stallings, in Jacksonville Florida federal court on January 15, 2013. Exhibit 1. The Government's press release further reveals that the Government has declined to join the Stallings suit insofar as it is alleged against Crowley, while intervening in, and settling, the Government's claims against Sea Star and Horizon for sums in excess of $3 million. *Id*.

Both the *Peake* Indictment, and the *Farmer* Indictment, make the same conclusory allegation that Peake, and Farmer, respectively, agreed to "rig bids submitted to government and commercial customers of Puerto Rico Freight Services." *Id*., ¶ 9(d). At the *Peake* trial, the Government presented the testimony of an alleged government victim—a representative of the Agriculture Department who procured shipping for the school lunch program in Puerto Rico. The Government has declined to identify its trial witnesses in this case. Nonetheless, the Government has identified hundreds of alleged "victims" in this case (Docket Entry No. 28), including numerous government entities including the Agriculture Department and the Department of Justice. *Id*. Moreover, the Government listed these alleged government victims in the victim notice filed in this case on April 30, 2013 (Docket Entry 28). Despite this, the Government suppressed the fact that it had a civil qui tam suit pending in Jacksonville Federal Court for this very alleged financial injury.

The Government has since made no disclosures to Farmer about the fact, pendency, or circumstances of its qui tam action. The Supreme Court has clearly held that witness bias evidence is subject to disclosure under *Brady*. *United States v. Bagley*, 473 U.S. 667, 676 (1985). *See also United States v. Rigas*, 779 F.Supp.2d 408, 413 (M.D. Pa. 2011) ("Both exculpatory evidence and evidence that can be used to impeach the prosecution's witnesses are considered 'favorable' under *Brady* and must be disclosed by the Government.") (citing *Bagley*). Indeed, the Justice Department's own *Brady* Guidelines (issued in 2010), direct that "known conditions that could affect a witness's bias" should be disclosed. DOJ Guidelines ¶ B7.

The Government never gave Farmer notice that it was considering, prosecuting, settling, intervening, or declining any civil claims based upon the allegations of its confidential informant Stallings even though such claims have been pending for the last year in Florida federal court. Further, the mountain of documents provided by the Government in discovery does not mention this suit previously filed on behalf of the Government. Finally, the Government has steadfastly contended that Mr. Farmer is criminally liable for the same conspiracy as Mr. Peake—despite the impossibility of Farmer participating in a vessel conspiracy addressed 100% to vessel cargo. Such a conspiracy would, according to the Government, include the Department of Agriculture as an alleged victim, but no related *Brady* disclosures have been made to date.

**A. Open File Document Discovery Does Not Satisfy the Government's *Brady* Obligations**

Where, as here, the Government produces voluminous documents, courts routinely hold that the mere production of documents does not satisfy the Government's *Brady* obligation to identify exculpatory material. *See, e.g.*, *United States v. Hsia*, 24 F. Supp.2d 14, 29 (D.D.C. 1998) (Friedman, J.) ("[O]pen-file discovery does not relieve the Government of its *Brady*

obligations. The Government cannot meet its *Brady* obligations by providing [defendant] with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack."). Here, the Government's production of more than 16 million pages of documents defies any reasonable characterization as the identification of exculpatory evidence. Indeed, the Indictment's conclusory allegations offer no guidance as to which document among the millions of documents would be exculpatory, largely confining the knowledge of exculpatory documents to the prosecution. By refusing to identify exculpatory documents within this massive haystack, the Government effectively suppresses them.

Indeed, the Department of Justice issued Guidelines in 2010 acknowledging that the prosecution has an affirmative duty under *Brady/Giglio* to review all documents it has obtained, from all agencies. DOJ Guidelines (Exhibit 6). Indeed, the DOJ Guidelines specify that "where there is an ongoing parallel civil proceeding in which Department civil attorneys are participating, such as a *qui tam* case, the civil case files should also be reviewed." *Id*. at ¶ B4. Federal courts have, in turn, looked to these DOJ *Brady* Guidelines to order federal prosecutors to conduct reviews of large quantities of produced documents in order to identify *Brady/Giglio* material. *See, e.g., United States v. Salyer*, 2010 WL 3036444, * 5 (E.D. Cal. Aug. 2, 2010).

In *Salyer*, for example, the court rejected a government contention that it would be too difficult for it to review its own voluminous production of documents. In rejecting this contention, the court relied upon facts equally applicable here:

> The Government argued at length that if it were required to presently, actually review the documentation it acquired, in order to identify *Brady/Giglio* materials, the burden of doing so would be impossible, even to the point of having to dismiss the case. If the Government professes this inability to identify the required information after five *years* of pre-indictment investigation, its argument that the defense can "easily" identify the materials buried within the mass of documents within *months* of post-indictment activity

>is meritless. Obviously, under the Government's reasoning, the defense burden is even more impossible. What the Government is actually arguing, in effect and for practical purposes, is—that logistics in the "big documents" case render *Brady/Giglio* a dead letter no matter who has the burden of ascertaining the information. There is no authority to support this evisceration of constitutional rights just because the case has voluminous documentation.

*Salyer*, 2010 WL 3036444, at *5.

Here, the Government has had in its possession for more than five years voluminous documents, obtained by warrant and subpoena, beginning with the corporate raids of April 17, 2008. There simply is no reason why it cannot comply with its *Brady* obligation to identify exculpatory material.

Had the Government complied with its *Brady* obligations, for example, it would have produced Government Exhibit 63 long ago. Further, the Government would have known long ago that the Farmer defense that the 50/50 vessel conspiracy was targeting Crowley was not "fallacious," or "ludicrous" as the Government told this Court last year.

### B. Documents Relating to the Government's Qui Tam Action Should Have Been Disclosed

The DOJ *Brady* Guidelines fully recognize that civil litigation conducted by government agencies, including SEC actions and quit tam actions (prosecuted by the Civil Division) can and do generate *Brady/Giglio* documents and information. DOJ Guidelines, ¶ B1.[5] The Guidelines

---

[5] "The investigative agency's entire investigative file, including documents such as FBI Electronic Communications (ECs), inserts, emails, etc. should be reviewed for discoverable information. If such information is contained in a document that the agency deems to be an "internal" document such as an email, an insert, an administrative document, or an EC, it may not be necessary to produce the internal document, but it will be necessary to produce all of the discoverable information contained in it. Prosecutors should also discuss with the investigative agency whether files from other investigations or non-investigative files such as confidential

11

specify that: "Where there is an ongoing parallel civil proceeding in which Department civil attorneys are participating, such as a qui tam case, the civil case files should also be reviewed." *Id.*, B4.

Moreover, courts have held that the decision of a civil government agency to decline prosecution constitutes *Brady* for purposes of a criminal prosecution. *United States v. Happ*, 2008 WL 5101214 (S.D. Ohio Nov. 25. 2008) (SEC declination of securities fraud suit is subject to disclosure under *Brady*); *United States v. Shaw*, 113 F. Supp.2d 152, 163 (D. Mass. 2000) (government must satisfy its *Brady* obligations as to qui tam action). *See also United States v. Rigas*, 779 F.Supp.2d 408, 414-15 (M.D. Pa. 2011) (ordering production of witness interview notes taken by SEC under *Brady*).

### C. The Government Should Produce its Sentencing Computations Used In Plea Negotiations.

In this case, the Government has secured the testimony of several cooperators by offering sentencing leniency or other benefits. Some of these cooperators will testify at the Farmer trial. Counsel for Farmer asked the Government to produce the Sentencing Guideline computations provided to these cooperators by the Government as part of their plea bargaining process. The Government has refused.

There can be no doubt that plea bargaining, including offers of leniency, are the subject of *Brady/Giglio* obligations. The DOJ *Brady* Guidelines specifically identify the following as suitable matters for disclosure:

Benefits provided to witnesses including:

---

source files might contain discoverable information. Those additional files or relevant portions thereof should also be reviewed as necessary."

- o   Dropped or reduced charges
- o   Immunity
- o   Expectations of downward departures or motions for reduction of sentence
- o   Assistance in a state or local criminal proceeding
- o   Considerations regarding forfeiture of assets
- o   Stays of deportation or other immigration status considerations
- o   S-Visas
- o   Monetary benefits
- o   Non-prosecution agreements
- o   Letters to other law enforcement officials (*e.g.* state prosecutors, parole boards) setting forth the extent of a witness's assistance or making substantive recommendations on the witness's behalf
- o   Relocation assistance
- o   Consideration or benefits to culpable or at risk third-parties

DOJ Guidelines, ¶ B7.

Information and documents relating to the plea bargaining process are subject to disclosure under *Brady/Giglio*. *United States v. Vasquez- Botet*, 453 F. Supp.2d 362, 370 (D.P.R. 2006) (Fuste, C.J.) ("We agree with Defendant that the government has a responsibility to produce material evidence relevant to its negotiations and final agreement with [cooperating witness]. . . .") (citing *United States v. Sudikoff*, 36 F. Supp.2d 1196 (C.D. Cal. 1999)), *aff'd on other grounds*, 532 F.3d 37 (1st Cir. 2008). A failure to disclose a witness's expectations of leniency constitutes a *Brady/Giglio* violation. *Tassin v. Cain*, 517 F.3d 770 (5th Cir. 2008).

In this matter, the Government obtained Rule 11(c)(1)(C) pleas from most of its cooperators (including its *Peake* trial witnesses Baci, Glova, and Serra). As a result, their sentences, and their severity, was a matter largely negotiated solely between the witness and the Government. The range of potential sentencing outcomes, therefore, was a directly dickered item between the witness and the prosecution. Under these circumstances, the range of potential sentencing, as memorialized in a Sentencing Guideline computation disclosed or provided to the witness by the Government, is direct evidence of the leniency being sought or provided.

### D. The Government Should Produce Its List of Telephone Targets.

Defendant is seeking an order compelling the Government to produce the list of targets for the Government's consensual telephone taping efforts on the morning of April 17, 2008 as a prelude to the execution of search warrants on corporate headquarters. When the FBI descended on Glova's home early on the morning of April 17, 2008, the agents held up the small army of agents prepared to initiate search warrant executions at the various corporate headquarters while they persuaded Mr. Glova in record time to commence calling various people to conduct staged consensual recordings (before the searches began) in exchange for leniency from the Government.

As the Court may recall, the first person that Glova called was his boss, Mr. Gabriel Serra. Mr. Serra did not respond, and Mr. Glova hung up. Exhibit 7. The agent suggested that Glova leave a voice message, which led to a second call to Serra with Mr. Glova leaving a voice mail message. Glova's voice message mentioned talking to "Frank," and when Glova hung up, the FBI agent continued coaching Glova, saying: "It's Frank Peek (ph)." *Id*. Mr. Glova responded with: "Yeah. On the list?" The FBI agent answered with an affirmative grunt.

This initial exchange between Glova and the agent taping the calls indicates that the calls planned for this concentrated period of time were conducted pursuant to a list prepared by the FBI agent. In other words, when the FBI arrived at Glova's home, the fact that the first call was placed to Glova's boss was pre-planned by the agents because Serra was the first person on their dance card.

The transcript reveals that Glova then immediately called "Peter" Baci and left another voice mail message asking Peter Baci to return the call to Glova's cell phone. Exhibit 7. The

FBI agent then told Glova that the agent wasn't concerned so much about reaching Peter because Baci was on his way to New York.

Glova then called Tom Farmer, and Farmer responded that he could not talk with Glova because he was having breakfast with his staff.  At this point, Glova had made four calls, none of which had yielded anything.  Glova unilaterally expressed his concern to the agent that Glova's plans to obtain leniency using a phone lifeline was in jeopardy.  He asked his FBI agent: "Does it make any difference with my leniency on cooperating?"  Ex. 7.  Glova's expressions of concern about getting sufficient credit for his phone calls under his hastily negotiated leniency deal comes within ten minutes of when he had started dialing at 7:35 AM.

During the *Peake* trial, defense counsel sought to introduce the portion of the recording transcript revealing that Glova was making calls based upon the agent's list.  January 23, 2013 Peake Transcript, at 7-11.  At no time during the *Peake* trial did the Government contend that the agent's list did not exist.  Further, the notion that the FBI agents would go to Glova's home to secure taped phone calls, knowing that they were holding up the execution of the search warrants by dozens of other agents and government attorneys, without any written plan as to whom they wanted to have Glova call, is unlikely.

The Defendant is entitled to the production of this list of telephone targets because, if Mr. Farmer's name is on it, it would be relevant to show that Mr. Glova was directed to telephone Mr. Farmer by the Government.  For a witness so easily and swiftly motivated to please the Government in hopes of leniency as Mr. Glova was in his kitchen on the morning of April 17, 2008, any suggestion by the agents to Glova about how to please them would be exculpatory.

> E. **The Agent Interview Notes From Which *Brady* Disclosures Have Been Made Should Be Produced**

15

The only substantive *Brady* response of the Government to Defendant's *Brady* letter requests was a summary of corrections, mostly in the form of omissions, from thirteen interviews of a total of eight witnesses (including correcting seven interviews of the three conspiracy witnesses who testified for the Government at the *Peake* trial (Glova, Baci, and Serra)). More specifically, the Glova interviews contained 17 errors or omissions, the Baci interviews contained 7, and the Serra interviews contained 6. These and 25 other alleged corrections to the Government interview memoranda (302s) were expressly made by the Government pursuant to *Brady*. Snyder Letter, at 1 ("based on a review of internal correspondence as well as notes taken by all in attendance at witness interviews, the Government provides the following information in addition to what is reflected in the Memorandum of Interview (MOI) that have already been provided to you:").

Because this information has been identified as *Brady* by the Government, there can be no dispute about the status of this information as falling within *Brady*. Separate and apart from the Government's admission that the missing or incorrect information is material enough to be covered by *Brady*, the discrepancies themselves may have impeachment value given their context. Despite this, the Government has refused to produce the notes used to make their *Brady* disclosures. *Brady* compels the production of interview notes that qualify as *Brady* material, regardless of whether the witness testifies at trial. *United States v. Rigas*, 779 F.Supp.2d 408, 413-15 (M.D. Pa. 2011).

## Conclusion

For the foregoing reasons, Defendants' Brady motion should be granted.

**CERTIFICATION**: I hereby certify having filed this motion through the EM/ECF filing system, which will notify all parties and counsel of record in this case.

Respectfully submitted,

Dated: April 3, 2014

By: /s/ _Terrance G. Reed_____
By: /s/ _V. Thomas Lankford __
Terrance G. Reed (Pro Hac Vice)
V. Thomas Lankford (Pro Hac Vice)
Lankford & Reed, PLLC
120 N. St. Asaph Street
Alexandria, VA  22314
(Phone) 703-299-5000
(Facsimile) 703-299-8876
tgreed@lrfirm.net
vtlankford@lrfirm.net

By: /s/ _Mark Rosenblum_____
Mark Rosenblum (Pro Hac Vice)
Mark Rosenblum, P.A.
1300 Riverplace Boulevard, Suite 601
Jacksonville, FL 32207
(Phone) 904-396-6100
(Facsimile) 904-346-4481
mark@markrosenblumlaw.com

By: /s/ _Joseph C. Laws_____
Joseph C. Laws (USDC-PR Bar No. 120306)
239 Arterial Hostos Avenue, Suite 402
San Juan, PR 00918
(Phone) 787-754-7777
(Facsimile) 787-763-5223
lawofficesofjosephlaws@gmail.com

*Counsel for Defendant Thomas Farmer*