**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**UNITED STATES OF AMERICA,**
Plaintiff,

v.

**THOMAS FARMER,**
Defendant.

Criminal Case No.  3:13-cr-00162-DRD

**DEFENDANT FARMER'S MOTION TO COMPEL
<u>AND FOR AN EVIDENTIARY HEARING</u>**

Dated: June 3, 2014

Terrance G. Reed (Pro Hac Vice)
V. Thomas Lankford (Pro Hac Vice)
LANKFORD & REED, PLLC
120 N. St. Asaph St.
Alexandria, VA  22314
(Phone) 703-299-5000
(Facsimile) 703-299-8876
tgreed@lrfirm.net
vtlankford@lrfirm.net

Joseph C. Laws
(USCD-PR Bar No. 120306)
239 Arterial Hostos Avenue, Suite 402
San Juan, PR 00918
(Phone) 787-754-7777
(Facsimile) 787-763-5223
lawofficesofjosephlaws@gmail.com

Mark Rosenblum (Pro Hac Vice)
MARK ROSENBLUM, P.A.
1300 Riverplace Blvd., Suite 601
Jacksonville,  FL  32207
(Phone) 904-396-6100
(Facsimile) 904-346-4481
mark@markrosenblumlaw.com

## TABLE OF CONTENTS

Table of Contents…………………………………………………………………………..…..i

Table of Authorities…………………………………………………………………………ii

Defendant Farmer's Motion to Compel and for an Evidentiary Hearing

    Applicable Standards……………………………………………………………...…1

    Argument……………………………………………………………………….3

        I.      Evidence of Spoliation is Material and Discoverable…………………………3

        II.     The Government Is In Possession and Control………………………………10
               Over Joint Investigation Documents.

              A.  Procedural Background……………………………………………………..10

              B.  The Government's Disavowal of Its Informant's Claims………………..13
                  Against Crowley Constitutes *Brady* Material.

        III.    The Government is in Possession and Control of……………………………20
               Cooperator's Documents.

        IV.    Competition Evidence Is Material and Exculpatory…………………………22

        V.     The Complete Cooperation Agreements Should Be Produced………………25

    Conclusion…………………………………………………………………………25

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Am. Rock Salt Co. v. Norfolk S. Corp.*, 228 F.R.D. 426 (W.D.N.Y. 2005)……………………..…21

*Asociación De Periodistas De Puerto Rico v. Mueller*, 680 F.3d 70 (1ˢᵗ Cir. 2012)……………...5

*Bank of New York v. Merdien BIAO Bank Tanzania Ltd.*
    171 F.R.D. 135 (S.D.N.Y. 1997),
    *aff'd*, 2007 WL 1518632 (S.D.N.Y. May 17, 2007). ,………………………….…………21

*Banks v. Dretke*, 540 U.S. 668 (2004)…………………………………………………..…………15

*Brady v. Maryland*, 373 U.S. 83 (1983)……………………………………………….………*passim*

*Giglio v. U.S.*, 405 U.S. 150 (1972)……………………………………………………...1, 25

*In re NTL Securities Litig.*, 244 F.R.D. 179 (S.D.N.Y. 2007)……………………………...…21

*In re Sealed Case*, 250 F.3d 764 (D.C. Cir. 2001)…………………………………………………20

*In re United States*, 441 F.3d 44 (1ˢᵗ Cir. 2006)……………………………………………….……20

*Kyles v. Whitley*, 514 U.S. 419 (1995)……………………………………........1, 3, 9, 10, 15, 17

*Linde v. Arab Bank, PLC*, 262 F.R.D. 136 (E.D.N.Y. 2009)………………………………………21

*U.S. v. Aquilar*, 831 F.Supp.2d 1180 (C.D. Cal. 2011)……………………………….…..…10

*U.S. v. Aviles-Colon*, 536 F.3d 1 (1ˢᵗ Cir. 2008)………………………………………………2, 24

*U.S. v. Bagley*, 473 U.S. 667 (1985)……………………………………………………..2, 15

*U.S. v. Bender*, 304 F.3d 161 (1ˢᵗ Cir. 2002)………………………………………..……16, 17

*U.S. v. Bestway Disposal Corp.*, 724 F. Supp. 62 (W.D.N.Y. 1989)……………………………23

*U.S. v. Gupta*, 848 F. Supp.2d 491 (S.D.N.Y. 2012)
    *aff'd on other grounds*, 747 F.3d 111 (2d Cir. 2014) ,………………………......…2, 18

*U.S. v. Hall*, 434 F.3d 42 (1ˢᵗ Cir. 2006)……………………………………………………1, 17

*U.S. v. Howell*, 231 F.3d 615 (9ᵗʰ Cir. 2000)………………………………………………3, 9, 23

*U.S. v. Joselyn*, 206 F.3d 144 (1ˢᵗ Cir. 2000)……………………………………………………22

*U.S. v. Kattar*, 840 F.2d 118 (1st Cir. 1988)…………………………………………...16

*U.S. v. Kilroy*, 523 F.Supp. 206 (E.D. Wis. 1981)…………………………………….21

*U.S. v. Martoma*, 2014 WL 31704 (S.D.N.Y. Jan. 6, 2014)………………………………...19

*U.S. v. McElroy*, 697 F.2d 459 (2d Cir. 1982)…………………………………………...24

*U.S. v. Misla-Aldarondo*, 478 F.3d 52 (1st Cir. 2007)……………………………………17

*U.S. v. Osorio*, 929 F.2d 753 (1st Cir. 1991)……………………………………………16

*U.S. v. Pesaturo*, 519 F.Supp.2d 177 (D. Mass. 2007)………………………………..2, 25

*U.S. v. Stein*, 480 F.Supp.2d 350 (S.D.N.Y. 2007)…………………………………….2, 21

*U.S. v. Sells Engineering, Inc.,* 463 U.S. 418 (1983)……………………………………20

*U.S. v. Stoll*, 2011 WL 703875 (S.D. Fl. Feb. 21, 2011)…………………………………...10

*U.S. v. Suarez*, 2010 WL 4226524 (D.N.J. Oct. 21, 2010)………………………………10

*U.S. v. Sudikoff*, 36 F.Supp.2d 1196 (C.D. Cal. 1999)…………………………………..2, 17

**FEDERAL RULES**                                                   **PAGE**

Fed. R. Crim. P. 16(a)………...……………………………………………1, 2, 20

Fed. R. Evid. 1003……………………………………………………………………...5

Defendant Thomas Farmer respectfully moves this Court, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1983) ("*Brady*") and its progeny,[1] and pursuant to Fed. R. Crim. P. 16(a)(1)(E) ("Rule 16") for an order compelling the Government to produce material and information as to which the Government has a burden to produce.   In addition, the Defendant asks this Court to order an evidentiary hearing to address unanswered issues as to the Government's compliance with its Rule 16 and *Brady* obligations.   Undersigned counsel certifies that they have conducted a meet and confer session with counsel for the Government, but they have declined to produce the requested material.

Specifically, Defendant Farmer seeks the following:

(i)       An Order to produce documents and information concerning the alteration and spoliation of paper documents obtained from Government cooperators Horizon Lines and its former employee Gregory Glova;

(ii)      An order to produce documents and information provided to the Civil Division, and the identification of those disclosing such material, in connection with the joint investigation of the Antitrust Division and the Civil Division of allegations of unlawful conduct by Farmer's employer, Crowley Maritime;

(iii)     An Order requiring the Government to search the records of cooperating companies Horizon Lines and Sea Star for purposes of producing Brady information;

(iv)     An Order requiring the Government to produce documents relating to competition against Crowley Maritime by Horizon Lines or Sea Star during the alleged time period of the alleged conspiracy (from 2005 until 2008);

(v)      An Order compelling the Government to produce documents relating to the cooperation agreements of Horizon, Sea Star, and their current or former employees.

## Applicable Standards

Under Rule 16 and under *Brady*, the Government is obligated to produce documents under its possession, custody, or "control."   Rule 16; *U.S. v. Hall*, 434 F.3d 42, 55 (1st Cir. 2006).   Here, as

---

[1]  *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419 (1995); *Giglio v. U.S.*, 405 U.S. 150 (1972).

further discussed below, documents are under the "control" of the Government if it has the practical or legal ability to produce them.  *U.S. v. Stein*, 480 F.Supp.2d 350, 361-62 (S.D.N.Y. 2007).  The Government's obligation to produce material also extends to factual material that is part of a joint investigation.  *U.S. v. Gupta*, 848 F. Supp.2d 491, 494-95 (S.D.N.Y. 2012), *aff'd on other grounds*, 747 F.3d 111 (2d Cir. 2014).

The Government is obligated under Rule 16 to produce discovery "material" to preparing a defense.  Fed. R. Crim. P. 16(a)(1)(E)(i).  Discovery is "material" under Rule 16 if it is either favorable or unfavorable to the defense.  *U.S. v. Pesaturo*, 519 F.Supp.2d 177, 191 (D. Mass. 2007).  Under *Brady* and its progeny, the Due Process Clause obligates the Government to produce favorable documents that are exculpatory to the charges, or which can be used to impeach the testimony of the government's witnesses.  *U.S. v. Bagley*, 473 U.S. 667, 676 (1985); *U.S. v. Aviles-Colon*, 536 F.3d 1, 19 (1st Cir. 2008)).

For pretrial purposes, the "materiality" standard for *Brady* is something of a misnomer because the *Brady* materiality standard is applied to post-judgment judicial analysis of the impact of the suppression of evidence upon a jury verdict.  *See, e.g.*, *Pesaturo*, 519 F.Supp.2d at 189 n.9; *U.S. v. Sudikoff*, 36 F.Supp.2d 1196, 1198-99 (C.D. Cal. 1999).   In a post-trial setting, *Brady* materiality requires an assessment of the trial record and the impact of suppressed evidence upon an adverse jury verdict.  *Id.* at 1200.  Here, this Court is confronted with *Brady* obligations in a pretrial setting.  The applicable disclosure standard is broader than the post-judgment standard, requiring disclosure of "all favorable evidence that is likely to lead to favorable evidence that would be admissible." *Id.* ("*Brady* requires disclosure of exculpatory information that is either admissible or is reasonably likely to lead to the discovery of admissible evidence").

The Supreme Court has also clearly identified a line of *Brady* materiality particularly applicable to this case and this motion—evidence that challenges the thoroughness of a criminal investigation. *Kyles*, 514 U.S. at 443.  *See, e.g.*, *U.S. v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000) (evidence of the "'thoroughness and even the good faith'" of a criminal investigation constitutes exculpatory, material evidence) (quoting *Kyles,* 514 U.S. at 443).  Here, for example, evidence that the documents of cooperators Horizon, Sea Star, Glova or Baci were altered or spoliated is directly relevant to the issue of the thoroughness of the government investigation.

**Argument**

**I.    Evidence of Spoliation is Material and Discoverable.**

The Government has produced to the defense a substantial number of copies of paper documents it claims to have obtained from Horizon Lines and its former employee Gregory Glova, and Sea Star's Peter Baci, but these documents are unmistakably altered and spoliated.   This material includes pages from bound diaries, daily journals, notebooks, and calendars which, for undisclosed reasons, have been separated from and razored out of their original binding.  In general, this spoliated material falls into two categories: (i) journal or diary entries and related documents attributed to Glova; and (ii) approximately sixteen handwritten journals kept by Baci covering the period from 2002 until April 2008.  Ex. 1, ¶ 5 (L'Etoile Declaration).  The defense first learned of their spoliated condition within the last two months, after the defense asked to look at the originals because the Bates-stamped copies of this predominantly handwritten material (authored by Government cooperators Glova and Baci) were often illegible or unclear.  *Id*. at ¶¶ 4, 6.

When the copies of this handwritten Glova and Baci material were first produced to the defense last year, the Government did not disclose that the original pages of these bound documents had been cut out of their binding and then were reshuffled, re-assembled, or discarded.  Because these

3

documents were presumably under the custody or control of the Government since approximately the searches of April 2008, the Government knew, or should have known, that its produced copies were neither complete nor in their original format--undermining their integrity--but the Government has made no such disclosure to the defense.

In April, 2014, the defense examined what the Government contends are the originals of these documents with the initial goal of improving upon the legibility of the "copies" of the originals as previously produced in discovery.  Ex. 1, ¶ 4.  A visual inspection of the originals confirmed, however, that most of the pages from each type of bound material (*i.e*., calendars, diaries, journals, and notebooks) had been cut out their bindings.  *Id*. ¶ 6. With the binding removed, the only existing means by which these pages were joined was by the presence of a binder clip clasping the remaining (now loose-leaf) pages to the original covers of the material. *Id*., ¶ 10.

Upon inspection, it was obvious that the cut out pages were not the complete set of original pages, and those original pages still present were not in the same chronological or consecutive order that the documents had been in their original format.  *Id*. ¶ 11. For example, the calendared material (*i.e*., daily journals, calendared) contained gaps in which entire periods, including months, were missing. *Id*.  Further, the cut and re-assembled notebooks included daily entries describing events (*i.e*., meetings) that were not in consecutive or chronological order.  *Id*. Government trial Exhibit 63, which describes a Glova meeting bearing a date of August 13, 2007, comes **after** pages for subsequent Glova meetings.  *Id*.

It is apparent that someone had taken a razor or box cutter to the pages in the bound material, sliced out all pages, and then replaced some but not all pages into the covers of the formerly bound material and then put binder clips on the re-assembled pages.  Because the produced copies bear consecutive Horizon, Sea Star, or Glova Bates-stamp numbers, and they appear to be full pages of

4

otherwise bound material, it is difficult to see from the Government-produced copies that the original material has been altered (*i.e.*, by razoring the pages, by reordering the pages, and by removing the missing pages). Even the spiral notebooks had their pages cut out, but the copies of the pages as returned have missing pages or contain material out of chronological order. Other material discrepancies also exist.[2] Because the original pages are no longer bound, it is entirely possible that new or different pages have been included in the copies now only held together by binder clips. The fact that this now-clipped material also includes random printed material (*i.e.*, printed emails or memos), only further undermines the integrity of the collected pages. Separate from the relevance of their spoliation, the incompleteness of the documents undermines their admissibility, making discovery on their condition material. *See, e.g.*, *Asociación De Periodistas De Puerto Rico v. Mueller*, 680 F.3d 70, 80 (1st Cir. 2012) (Fed. R. Evid. 1003 permits evidentiary challenge based upon extensive prejudicial manipulation of document).

The Government should have been aware of the spoliated nature of these original documents since they were in this unnatural state for years. At no time prior to the Government's production of the originals at the defense's request, did the Government disclose to the defense that these original documents were altered or spoliated. Exhibit 1, ¶ 6.

This material is important because: (i) Glova and Baci are key government witnesses; (ii) some if not all of the affected documents are handwritten material that appear to be authored by either Glova or Baci (*i.e.*, they are their personal journals, notebooks, or calendars); (iii) the Government has identified selected pages from these Glova-and-Baci-authored notes as Government trial exhibits; and (iv) the Government has also generically identified as its Exhibit 158, "Selected entries from

---

[2]  For example, a calendar page contains a photographed copy of a diary page for March 28, 2006, instead of a copy of the actual paper page, but nonetheless appears in the consecutive Bates-numbered copies produced by the Government as though it was a copy of a paper page. Ex. 1, ¶ 11.

Greg Glova's handwritten calendars seized on 4/17/08 from Horizon Lines, including but not limited to, the example in Exhibit 4."

After inspecting the original journals, calendars, and notebooks, in April 2014, the defense pointed out the alterations to the prosecution and asked the Government to produce chain of custody documents for this material. *See* Ex. 2B (Requests 5 & 6).[3] The Government declined to do so, and justified its position on the ground that it was not intending to use chain of custody documents in its case-in-chief, and therefore had no obligation to disclose such documents to the defense. *See* Ex. 2C (Answers 5& 6).

During the subsequent meet and confer, the defense challenged the Government's refusal to produce chain of custody documents on the sole ground that such documents are not Government trial exhibits.   The Government then took the position that, even if it had chain of custody documents, it had no obligation to produce them to the defense. The defense pointed out that this, too, was an inadequate response because the unexplained alterations of, and deletions from, the original documents cast doubt on the authenticity of the remaining pages, and confirmed that the documents were incomplete.  The Government declined to provide any further information on the status of the altered documents on the ground that it was not obligated to do so.

Because original pages covering entire periods of time (*e.g*., the months of May 2006 and November 2006) during the alleged conspiracy are missing, Ex. 1 ¶ 8, the defendant has been denied the right to review or to use this missing material.  The documents at issue (*i.e*., journals, calendars, notebooks) have been identified by the Government as coming from the desk or office of Glova at

---

[3]  The defense clearly identified authenticity as a *Brady* issue in its April 2013 request for chain of custody documents for any document that the Government intended to use at trial.  Exhibit 4 (Request 20).  The Government's trial exhibits include handwritten material of both Baci and Glova from the spoliated diaries, journals, and notebooks.

Horizon or from Baci at Sea Star.[4]  Ex. 1, ¶ 13. The majority of the remaining pages from the original bound material appear to be handwritten by either Glova or Baci (*id*.), creating the likelihood that the missing pages contain similar handwritten material authored by the Government's key trial witnesses.   As purported daily or recurring statements authored by these witnesses for years in their own handwriting, these missing notes are undoubtedly material to the defense.

By way of background, the Government prosecuted a former Sea Star employee (Alex Chisholm) for obstructing justice (specifically, obstructing the Jacksonville grand jury investigation) by attempting to delete conspiratorial information in response to the April 16, 2008 search warrant. Ex. 3, ¶ 3.  Similarly, the Government sought and obtained a sentencing enhancement for Baci for directing Chisholm to delete electronic information in response to the same search warrant. Furthermore, a cooperating Horizon employee and immediate subordinate of Glova, admitted that when he found out about the April 17, 2008 search of Horizon's offices, he placed incriminating documents in a plastic bag and buried them in his back yard.  From early on in this investigation, the Government was on notice of the risk of spoliation, including destruction by its cooperating witnesses.

The documents at issue bear Bates-stamp identifiers indicating that they came from Horizon, Sea Star, Glova or Baci.  Exhibit 1, ¶ 13. After Baci and Glova became government cooperators in 2008, the Government interviewed Glova and Baci on multiple occasions over numerous days during the five years of investigation preceding the indictment in this case.  *Id*., ¶ 14.  The interview memoranda and reports of the government agents attending these interviews confirm that over these years both cooperators had access to, and reviewed, their personal journals and diaries before and during these interviews. *Id.*  In all of this interview material, however, there is no government

---

[4]  The defense previously asked the Government to produce the inventories from the Horizon corporate search, the Glova home search, and Sea Star search warrant executions, but the Government has refused to do so.

inquiry into, or discussion of, the fact that thousands of pages of these cooperator's personal, handwritten, documents have been removed from their original binding material, re-assembled in a different format, and spoliated. *Id*.  Given the fact of spoliation at the time of the original search (pled to by Baci and Chisholm and admitted by a Glova subordinate at Horizon), the prospect that such spoliation could continue was not negligible.  Now, the fact of spoliation cannot seriously be disputed—the documents are cut out of their original binding material, are missing, or are Bates-numbered in an order different to their original chronological or consecutive sequence.

Despite clear requests from the defense, the Government has refused to explain how these documents were cut, lost, Bates-numbered out of sequence, or re-ordered out of sequence.[5]  The Government's only suggested explanation is that the documents must have been in that condition when they were originally seized.  But this is not plausible unless Glova and Baci systematically engaged in surgery on their own personal documents prior to the search—a fact that would undermine their credibility as a cooperating witnesses.  The purpose of maintaining notes in a calendar or notebook is to maintain a complete and readily accessible record, which is presumably why both Baci and Glova entered their diaries in bound books going back to as far as 2002.  The routine razoring of such pages and entries from bound and dated books by Glova and Baci would leave an incomplete chronicle of their daily activities for the duration of the 50/50 conspiracy. Much more plausible is that the spoliation took place after the original search, while the documents were nominally in the custody of the Government, or actually in the control of its cooperators (i.e., Horizon, Glova, or Baci).

---

[5]  On April 19, 2013, the defense asked the prosecution for: "Any document or information relating to the lack of authenticity of any document provided to the Government in the cabotage investigation." Ex. 4 (Request 9). The defense similarly asked for any document or information about spoliation or document alteration by "any individual who was interviewed by the Government in connection with the cabotage investigation," which would include Mr. Stallings. Id. (Requests 7, 18).  By failing to respond to these, or to any other specific *Brady* request made by the defense in April, 2013, the Government concealed the alterations at issue here.

In the immediate aftermath of the April 2008 search of Horizon's offices; Horizon, Sea Star, Glova and Baci entered into cooperation agreements with both the Government and with civil class counsel.   The agreement with civil class counsel, for example, affirmatively obligated Horizon, Sea Star, Glova and Baci to share with class counsel their documents that had been seized by the Government.  Ex. 6 ¶ 24; Ex. 7 ¶25 & 8.   The two vessel companies, Glova and Baci further expressly agreed to assist civil class counsel with their efforts to pursue civil claims against Crowley. *Id*.   In return, the vessel companies, Glova and Baci obtained releases from liability conditioned upon fulfillment of this cooperation agreement.   The vessel companies, Glova and Baci also entered into cooperation agreements with the Government as part of their plea agreements (although some provisions of these cooperation agreements have been withheld from the defense and are subject to this motion to compel).

Whether for civil or for criminal liability purposes, the vessel companies, Glova and Baci were fully incentivized to help themselves by incriminating Crowley and Mr. Farmer.  This, indeed, is a well-plowed defense to criminal charges (*i.e.*, the defendant's accusors have been incentivized to help themselves avoid the consequences of their crimes by incriminating the defendant) making such evidence fall well within the reach of the *Brady* doctrine.  Spoliation of the evidence—either before or after the Government obtained initial custody of the documents—is therefore material under both Rule 16 and *Brady*.   In addition, any evidence indicating that the Government allowed or permitted its cooperators to alter evidence is independently relevant to challenge the thoroughness of the criminal investigation.  *Howell*, 231 F.3d at 625 ("In *Kyles v. Whitley,* the Court explained that information which might 'have raised opportunities to attack ... the thoroughness and even good faith of the investigation ...' constitutes exculpatory, material evidence") (quoting *Kyles*, 514 U.S. at

443); *U.S. v. Aquilar*, 831 F.Supp.2d 1180, 1202 (C.D. Cal. 2011) (citing *Kyles*, dismissing

indictment after trial for failure to disclose evidence of shoddy investigation).

As a result, this Court should compel the Government to provide a chain of custody to the

defense for the previously bound journals, diaries, calendars, and notebooks of Glova and Baci, and

then conduct an evidentiary hearing at which Glova and Baci can be examined about their

documents and their current condition.  With or without such an order, this Court should grant the

defendant a spoliation jury instruction.  *See, e.g., U.S. v. Suarez*, 2010 WL 4226524, *9 (D.N.J. Oct.

21, 2010) (defendant entitled to spoliation instruction based upon government's negligent failure to

preserve text messages between FBI agent and cooperating witness); *U.S. v. Stoll*, 2011 WL 703875,

*2 (S.D. Fl. Feb. 21, 2011) (citing *Suarez*).

## II.   The Government Is In Possession and Control Over Joint Investigation Documents.

After completing the meet and confer process, the Government refuses to produce,

information and documents relating to the Government's qui tam action commenced in the Middle

District of Florida in January 2013 by the Government's original and primary informant, William

Stallings, alleging carrier collusion in government contracts.  The Government has consistently

refused to do so, claiming that it has no *Brady* or discovery obligation with respect to the decisions

of the Antitrust Division and the Civil Division of the Justice Department in 2013 and 2014 finding

that they collectively possessed insufficient evidence to prosecute Crowley—under a civil pleading

standard—for making false and collusive rate claims against the Government from 2002 through

2008.   The Government misapprehends its *Brady* obligations.

### A.  Procedural Background

In April 2013, one of the many specific *Brady* requests made by the defense which the

Government then ignored was a request for information "relating to the credibility of any individual

interviewed in connection with cabotage investigation, including but not limited to any government

10

document filed in any court." Ex. 4 (Request 8). Further, the defense asked for "any information suggesting that Thomas Farmer was not a participant in the conspiracy alleged in the Indictment." *Id*. (Request 9). In addition, the defense asked the prosecution for any documents or information as to the bid rigging alleged in Indictment ¶ 9(d), specifically asking for information indicating that Mr. Farmer "was not a participant." Exhibit 5. (Request 4).[6] The Government declined to respond to this request in the same manner as it failed to respond to all written defense *Brady* requests.

In March 2014, the two vessel companies announced that they had settled a qui tam action brought on behalf of the Government by the Government's informant Stallings (the former head of sales at Sea Star). On April 3, 2014, the defense filed a motion to compel *Brady* disclosures based in part upon the Government's failure to disclose that it had been litigating this Florida qui tam action for the prior year, and the Government had determined not to pursue the pled claims therein against Crowley. Dkt. No. 81. On April 7, 2014, this Court promptly issued a direct order to the Government to comply with its *Brady* obligations, and to file a notice of compliance "itemizing the material made available to defendant," by April 21, 2014. Dkt. No. 84.

On April 16, 2014, the Government filed a brief opposing defendant's *Brady* motion and gave notice of compliance. Dkt. No. 97. The Government's brief contended: (i) notwithstanding its nondisclosure regarding the quit tam litigation, it had satisfied its *Brady* obligations; and (ii) it had no *Brady* disclosure obligations regarding the Civil Division's qui tam action regardless of Department's own manual acknowledging such a *Brady* disclosure obligation for qui tam actions, because the U.S. Attorney's Manual imposed no obligations on federal prosecutors. *Id*.

---

[6] Just this week, the Government has attempted to explain its instruction to the grand jury that this case does not involve bid rigging on the ground that the Indictment bid-rigging allegations of paragraph 9(b)) do not apply to Mr. Farmer because he is allegedly not being accused of bid rigging, notwithstanding the unambiguous language of the Indictment making this very allegation.

Later in the day (April 16th), after filing its *Brady* Opposition brief with this Court, the Government sent a side letter to defense counsel indicating for the first time that the Antitrust Division received at least two inquiries in 2013 from the Civil Division handling the qui tam action asking for the Antitrust Division's assistance in determining whether sufficient evidence exists to support the qui tam allegations made by Stallings against Crowley.   Ex. 10.   The April 16, 2014 Antitrust Division letter, indicated that this information was being provided to the defense purely as a "courtesy."  This letter unquestionably confirms that the Civil Division sought the assistance of the Antitrust Division in investigating Crowley, that the Civil Division obtained from the Antitrust Division factual information and evidence about Crowley, and that the information exchanged was exculpatory, as was later confirmed by the Civil Division's decision to drop the qui tam claims against Crowley while this case was pending.   None of this had been disclosed to the defense or to this Court while it was happening in 2013 and 2014.

The following week the Court held a telephonic status conference (on April 30, 2014) during which defense counsel explained that they were attempting to exhaust the meet and confer process as to *Brady* and discovery issues, and they hoped to complete this process by the end of  May.  In May 2014, the defense sought from the prosecution, in writing and orally, disclosure of the information and documents exchanged between the Civil Division and the Antitrust Division, and the identities of the individuals making such disclosures.  Ex. 2B (Requests 2-4).  During the meet and confer process, the Government declined to produce any information or documents regarding disclosures between the Antitrust Division and the Civil Division regarding their mutual investigations of Crowley and its conduct.  Ex. 2C (Answers 2-4).

B. **The Government's Disavowal of Its Informant's Claims Against Crowley Constitutes** *Brady* **Material.**

The Government admits (as it must) that the March 2013 Farmer Indictment alleges that Farmer is criminally liable for "agreeing during those meetings, conversations, and communications to rig bids submitted to government and commercial customers of Puerto Rico freight services." Indictment, ¶ 9(d). By contrast, the Government has now admitted, in its April, 2014 side letter to defense counsel, that:

(i)     the Antitrust Division responded to the June 2013 inquiry of the Civil Division about the previously pled civil qui tam allegations of Crowley collusion with the vessel companies on government contracts, that the Antitrust Division "did not have any evidence that Crowley colluded with its competitors to fix prices bid for government contracts. . . ;" and

(ii)     on November 12, 2013, the Civil Division notified the Antitrust Division that it still "lacked evidence that Crowley colluded with competitors to fix the prices of U.S. government contracts," it asked the Antitrust Division again for its assistance in obtaining such evidence, and the Antitrust Division responded at some unknown time that "it did not have any new evidence regarding Crowley that implicated government contracts."

Ex. 10.

Since the return of the Indictment, both the Antitrust Division and the Civil Division-based upon their parallel and joint investigations—have contradicted the Indictment's allegation accusing Farmer of conspiring to rig bids for government contracts. For good measure, both the Antitrust Division and the Civil Division directly impeached the pled civil allegations of Government confidential informant and cooperator Stallings upon whom the Government has relied to initiate and to pursue its criminal investigation in this case. Mr. Stallings' May, 2008 cooperation agreement with the Antitrust Division requires that Stallings, among other things, respond "fully and truthfully to all inquiries of the U.S. in connection with the anticompetitive activity being reported, without falsely implicating any person or intentionally withholding any information." Ex. 11

(¶2(c)).  Mr. Stallings was not free to make baseless civil allegations, much less be financially rewarded by the Government as a result.

Despite having thus contradicted the Indictment's allegations and its own informant and cooperator's pleadings made on its behalf, the Government contends that the joint factual investigations and conclusions of the Antitrust and Civil Divisions (during 2013 and 2014) that they (together) possess insufficient evidence to charge Crowley civilly as to any government contract from 2002 through 2008 does not rise to the level of *Brady* material. With all due respect, that is simply wrong.

The Government's position that Stallings' 2013 pled allegations against Crowley on behalf of the Government—and the Government's considered rejection of them--are both immaterial to this case, is belied by its own acts over the last five years.   Throughout 2013, the Government provided the defense with discovery relating to Stallings (*e.g.*, his 17 tapes made for the government and numerous interview reports).  This Stallings material was identified by the prosecution as being produced pursuant to its *Brady* and Rule 16 obligations. Ex. 1, ¶ 15.  Indeed, the Court may recall that, in mid-August 2013, the Government found a missing Stallings tape of a two-hour meeting with Baci in April 2008, less than a week before the Government obtained its search warrants based upon Stallings tapes.  Having predicated its search warrant applications, and its subsequent criminal cases, upon Stallings' allegations, the Government followed through in this case by producing the Stallings' documents, information, interviews, and tapes in discovery to the defense.  At no time during this five year process did the Government announce publicly, or privately to the defense during discovery, that it considered Stallings' allegations, including his pled civil allegations, insufficiently credible to warrant pursuing a government financial recovery based upon them for financial losses allegedly caused by Crowley.  The fact that the prosecution would vouch for

Stallings to get a Crowley criminal search warrant from the Florida Federal Court in 2008, but then (with the benefit of six years of further investigation) formally disavow Stalling's pled civil allegations against Crowley in the same court in 2014, is exculpatory.

Further, the fact that the Antitrust Division would, after five years of investigation, tell the Civil Division twice in 2013 that the Government has no qui tam claim based upon the Antitrust Division's continuing evaluation of the Government's collective evidence, is highly exculpatory. In this regard, Mr. Stallings' status as both the sole "confidential informant," and also the potential recipient of a Government reward, are both exculpatory facts.

In *Kyles*, 514 U.S. at 443, the Supreme Court held that the prosecution's withholding of evidence undermining the credibility of a *non-testifying government informant* ("Beanie") violated *Brady*. 514 U.S. at 445. To that end, the Court made clear that the suppressed evidence of the unreliability of the non-testifying informant was exculpatory because it would undermine the thoroughness of the government investigation. *Id*.

After the Government intervened in the qui tam action, the Sea Star announced that the Government was awarding Stallings more than $500,000 from the proceeds of the qui tam action for his role as an informant and relator. At no time during the discovery of this case has the Government informed the defense that Stallings was a potential or actual financial beneficiary from his role as informant. The Supreme Court, however, has held that even the potential for a reward from the Government constitutes *Brady*. *Bagley*, 473 U.S. at 683 (mere possibility of an award to informant, without a binding promise to do so, constitutes disclosable *Brady* obligation). *Accord*, *Banks v. Dretke*, 540 U.S. 668, 698 (2004) (informant's status as a paid police informant constitutes *Brady* material because "beyond doubt" such information would have been helpful to defense). Finally, the First Circuit has long held that "a prosecutor 'using a witness with an impeachable past

has a constitutionally derived duty to search for and produce impeachment evidence requested regarding a witness.'" *U.S. v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002) (quoting *U.S. v. Osorio*, 929 F.2d 753, 761 (1st Cir. 1991)).  Despite providing the defense with purportedly incriminating evidence in its possession furnished by Stallings, the Government provided the defense with none of the exculpatory evidence in its possession upon which it discredited Stallings' allegations against Crowley.

Here, the facts and circumstances of the factual investigation undertaken by both the Antitrust Division and the Civil Division are material both because they contradict the direct allegations of the Indictment (¶9(b)), and also raise doubts about the credibility and bias of the Government's informant, Stallings.  Despite this, the Government has made no *Brady* disclosure as to the qui tam action, and it has refused to produce the documents evidencing the joint investigation of the Antitrust and Civil Division with respect to Crowley.

The principal argument offered by the Government for denying any *Brady* disclosure obligation is that the Civil Division was not part of the "team" prosecuting this case.  But, of course, the Antitrust Division is unquestionably part of the "team" prosecuting this case, and the Government nonetheless disclaims any *Brady* disclosure obligations by the Antitrust Division prosecutors in this case as to what the Antitrust Division did in connection with the qui tam action.  Indeed, the fact that the Civil Division would seek, and the Antitrust Division would supply, factual analysis of the evidence available against Crowley confirms that this was a joint undertaking.

Furthermore, the First Circuit has not embraced the Government's proposed "team" defense to *Brady* obligations.  *See, e.g.*, *U.S. v. Kattar*, 840 F.2d 118, 130-31 (1st Cir. 1988) (criminal prosecutors had *Brady* disclosure obligations for briefs filed by the Civil Division in civil litigation) *Kattar* also instructs that even civil litigation material of the Government can be admissible at a

16

criminal trial as an admission of a party opponent in a criminal trial. *Id.* Accordingly, in this pretrial

context, the factual record compiled by either or both the Antitrust Division and the Civil Division

undoubtedly will contain "exculpatory information that is either admissible or is reasonably likely to

lead to the discovery of admissible evidence." *Sudikoff*, 16 F.Supp.2d at 1200.

The Government has cited *Bender* as holding that the Government's *Brady* obligations are

limited to members of its "team." Dkt. No. 97, at 8 (*Bender*, 304 F.3d at 164).[7] But *Bender* did not

so hold. Instead, the *Bender* opinion simply observed that information available to those acting on

behalf of the government must be searched, which "include[s] other members of the prosecution

team, including police investigators working for the prosecution." *Id.* at 164 (citing *Kyles*). This is

inclusive, not exclusive, language, and *Bender* did not purport to limit the prosecutor's *Brady* duties

to his hand-picked "team." For that matter, the First Circuit has since pointed out that the "team"

language in the *Bender* opinion is mere *dicta*. *U.S. v. Misla-Aldarondo*, 478 F.3d 52, 65 n.8 (1st Cir.

2007) (characterizing "team" language from *Bender* opinion as "dictum").[8]

Furthermore, the Antitrust Division has admitted that it twice participated in the Civil

Division's investigation of Crowley during 2013 and into 2014. Ex. 10. It did so while prosecuting

the Indictment in this case alleging defendant Farmer's complicity in rigging bids for government

contracts. The information and documents sought by defendant would demonstrate both the conduct

---

[7] The Government citation to *Hall*, 434 F.3d 42, is equally misplaced. In *Hall*, the First Circuit held that a prosecutor did not violate *Brady* by failing to produce impeachment material he did not have but rather which was in the exclusive possession of the court's probation office. *Id.* at 55.

[8] The "team" concept is especially inapt in a case like this one, where almost half of the numerous witness interviews (including the interviews of all defendants who have pled) were conducted by agents from outside of the Justice Department, including agents from the Defense Department, the Agriculture Department, and the Transportation Department. Ex. 1, ¶ 16. Presumably, these agents were keen to unearth any evidence that their agencies overpaid Crowley.

undertaken by the Antitrust Division and its involvement with the ongoing joint and parallel factual

investigation of the Civil Division.

That, after all, is the relevant issue—whether allegedly separate government agencies or

divisions are conducting a "joint investigation."   Joint investigations involve fact-gathering

conducted by different federal agencies.  In *Gupta*, for example, Judge Rakoff of the Southern

District of New York held that a joint investigation by the SEC and the U.S. Attorney's office

required the U.S. Attorney's office to produce exculpatory information obtained by the SEC.

As the *Gupta* opinion explained:

But whether parallel investigations are also 'joint' investigations must be evaluated in light of the
disclosures being requested, and when it comes to *Brady* disclosures, the relevant context is one of
fact-gathering, not charging determinations or otherwise. For *Brady* purposes, it is enough that the
agencies are engaged in joint fact-gathering, even if they are making separate investigatory or
charging decisions, because the purpose of *Brady* is to apprise the defendant of exculpatory evidence
obtained during the fact-gathering that might not otherwise be available to the defendant.

While the language in the case law is not always consistent with this distinction, joint fact-
gathering is part of what is often referred to as 'joint investigation,' triggering a *Brady* obligation,
even if it is not a 'joint prosecution.' Factors that the Government here emphasizes, such as the
independence of the two agencies' 'charging decisions' and trial strategy, may show that this is not a
'joint prosecution,' but they have no bearing on joint collection of exculpatory information
that *Brady* compels the prosecutor to disclose. For purposes of *Brady* how the agencies use the facts
discovered jointly is irrelevant, and the joint investigation need not result in a joint prosecution. And
where the investigation is conducted jointly, the Government is charged with reviewing all
documents and information connected to that joint investigation and disclosing any exculpatory
information.

A 'joint investigation' also does not require a coterminous investigation, as the Government
suggests when it argues that the SEC began its administrative investigation well before the
Government began its criminal investigation. An investigation may be joint for some purposes; it
may be independent for others.

*Gupta*, 848 F. Supp.2d at 494-95.

Here, there is no question that exculpatory evidence exists from a joint investigation and is in the

control of both the Antitrust and Civil Divisions.  The Antitrust Division (after a five year

investigation) and the Civil Division (after at least a one year investigation) concluded both

separately and together that there was insufficient evidence to support a civil allegation of Crowley culpability regarding government contracts from 2002 until 2008.  Undoubtedly, there is a paper trail for this joint undertaking, but the Government wants to conceal the investigated facts and the resulting record.

Of course, the logical place to start such an investigation would be to ask the Government cooperators who orchestrated the bid rigging of government contracts for Horizon (Glova, Serra) and Sea Star (Baci).  An equally obvious place to start would be to ask Government informant and cooperator William Stallings for the evidence supporting his pled civil accusations on behalf of the Government.  The Government has offered no evidence of this.

While the Government produced to the defense during 2013 multiple interview reports and other material for these cooperators, it produced nothing regarding any communication between the Government and Glova, Baci, Serra, or Stallings during 2013 or 2014 concerning Crowley.  Perhaps Stallings' credibility had sunk sufficiently in the eyes of the Antitrust Division by 2013 that his pled civil allegations could be discredited without any further investigation, but that it not what the Antitrust Division claims it did—it admits that it investigated the evidence applicable to Crowley twice during 2013 for the benefit of the Civil Division, after receiving the Civil Division's requests of June 10, 2013 and November 12, 2013. Ex. 10.   It also refuses to disclose any fact regarding this joint factual investigation. Ex. 2C (Answers 2-4).

Courts do not accept such stonewalls when it comes to joint investigations. Where the Court does not have any information about the nature of the relationship between the criminal investigation and a related civil one, further inquiry is justified.  *See, e.g*. *U.S. v. Martoma*, 2014 WL 31704, *6 (S.D.N.Y. Jan. 6, 2014) (requiring Government to provide information on parallel investigations).

Here, because the Antitrust Division has admitted that it participated in the fact gathering process for purposes of the qui tam action, its personal *Brady* obligations are clear.  Further, because the Antitrust Division was actively involved in the fact gathering process on behalf of the Civil Division, it must review and disclose the *Brady* material obtained by the Civil Division as well.[9]

**III.    The Government is in Possession and Control of Cooperator's Documents.**

During the meet and confer process, the Government admitted that it did not undertake to review the documents of the cooperating carriers Horizon and Sea Star for *Brady* material.  Instead, the Government limited its *Brady* review to the documents it seized from these carriers under search warrants or those which the carriers have since provided to the Government pursuant to their cooperation agreements with the Government.   The defense pointed out that *Brady* applies to all documents under the Government's "control," and these would include the documents accessible to the Government by virtue of its cooperation agreements with Horizon and Sea Star.   The

---

[9]  Separate and apart from the exculpatory content of these disclosures, the prosecutors labored under well- established prohibitions under Fed. R. Crim. P. Rule 6 against sharing grand jury material with the Civil Division absent a prior court order.  *See, e.g., U.S. v. Sells Engineering, Inc.,* 463 U.S. 418 (1983) (Civil Division must obtain court ordering authorizing access to grand jury material).  The Government has confirmed that it had not sought or obtained a court order under Rule 6 authorizing disclosure of grand jury material from the three relevant courts supervising the grand juries in this case (the Middle and Northern Districts of Florida, and the District of Puerto Rico).  *See In re Sealed Case*, 250 F.3d 764, 768 (D.C. Cir. 2001) (transmission to *qui tam* district court under seal of summary of witness grand jury testimony from another district court without disclosure order from grand jury court violates Rule 6).

Here, the Antitrust Division has confirmed that it disclosed information to the Civil Division for purposes of its qui tam investigation.   The standard application to a district court's obligation in this Circuit to investigate potential Rule 6 violations is broad—a "mere suspicion" of disclosure is sufficient to justify court investigation.  *In re United States*, 441 F.3d 44. 58 (1st Cir. 2006) ("mere suspicion may be enough to cause further inquiry into' Rule 6 violations; rejecting "prima facie" standard as too high).  The Antitrust Division has refused to disclose what it disclosed to the Civil Division other than sufficiently detailed descriptions of its evidence to permit the Civil Division to rely upon the matters disclosed for pursuing the government's own claims in litigation.  The Antitrust Division, citing grand jury secrecy among other concerns, conditioned defendant's access to this same evidence for purposes of this case upon a protective order signed by this Court.

Government rejected this, and refused to conduct any *Brady* inquiry with respect to documents available to it under the aforementioned cooperation agreements.   This is *Brady* error.

When the Government enters into a criminal cooperation agreement with a corporation, the government is in possession, custody, and control over the cooperating company's documents for purposes of Rule 16 and of *Brady*.  *Stein*, 480 F.Supp.2d at 361-62 (citing *Kilroy*, 523 F.Supp. 206). The Government has entered formal cooperation agreements with Horizon and Sea Star, and the Government has admitted that these carriers have provided documents to the Government pursuant to those agreements.

By exercising control over the carrier's documents, that is, by formal contractual agreement, has the legal right to control access to the corporation's documents.  *Stein*, 480 F.Supp.2d at 360.   The same concept of legal control has been applied, in civil cases, to construe Fed. R. Civ. P. 34 & 45 as requiring production of documents when a corporation has contracted to assist another company in litigation, *Am. Rock Salt Co. v. Norfolk S. Corp*., 228 F.R.D. 426, 457 (W.D.N.Y. 2005), or merely possesses a contractual right to obtain documents from another entity.  *In re NTL Securities Litig*., 244 F.R.D. 179, 195 (S.D.N.Y. 2007) ("'documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action'") (quoting *Bank of New York v. Merdien BIAO Bank Tanzania Ltd*., 171 F.R.D. 135, 146 (S.D.N.Y. 1997)), *aff'd,* 2007 WL 1518632 (S.D.N.Y. May 17, 2007).  Indeed, merely having the practical ability of obtaining access to documents is sufficient to have "control" over them under the federal civil rules*.  Linde v. Arab Bank, PLC*, 262 F.R.D. 136, 141 (E.D.N.Y. 2009).

Here, it is undisputed that the Government has refused to review the Horizon and Sea Star documents under its control by virtue of its cooperation agreements with these two carriers.

21

Accordingly, the Government has not complied with its *Brady* obligations.  While the First Circuit has indicated that where the Government has no contractual relationship with a company that is a victim of crime the Government does not possess its records, *U.S. v. Joselyn*, 206 F.3d 144, 152-53 (1st Cir. 2000) (denying new trial motion), it is undisputed here that such a contractual relationship exists between the Government and Horizon and Sea Star.

**IV.   Competition Evidence Is Material and Exculpatory.**

The Government has refused to search for, or to produce competition evidence based on its position that evidence of competition between Crowley and the other carriers (and vice versa) is not exculpatory, and therefore not *Brad*y material because the Government believes that the presence of competition does not negate the presence of collusion.  The Government disagrees that competition evidence is exculpatory and prefers to characterize all competition evidence as simply "cheating" on the alleged conspiracy.  Dkt. No. 97, at 6.   From this denial, the Government claims it "should not be forced under the guise of *Brady* to adopt defendant's theories of the case and then search for evidence supporting those theories." *Id.*   The Government misapprehends its *Brady* obligations as limited to evidence that convinces the prosecution the defendant is not guilty.  To the contrary, the purpose of *Brady* is to funnel exculpatory evidence to the jury, not to force seasoned prosecutors to recant.

There can be no question that the defense timely asked the prosecution for this competition evidence, as it is requested in the defense *Brady* letter of April 19, 2013.  Ex.  4 (Requests 15-17, 45-49) (asking for information relating to competition by carriers against Crowley).  Significantly, during the meet and confer in May 2014, the Government denied having any objection to searching for such competition evidence on the grounds of burdensomeness.   Even though the Government admits it would not be burdensome for it to produce competition evidence, it has refused to do so.

22

Further, even though this Court's Brady order directed the prosecution to file a notice of compliance "itemizing the material made available to defendant," the prosecution has not itemized any competition evidence, instead taking the position that any such evidence can be unearthed in the 16 million pages of discovery it has produced, which it has also offered to the defense as the location in which to find the government's criminal charges.

In substance, the Government position is that because antitrust co-conspirators can cheat on each other, any evidence of competition is not exculpatory as a matter of law.  Initially, of course, that is not the prerogative of the Government—it is the jury that weighs the significance of competition to determine if, in fact, the alleged members of the conspiracy are adversaries or co-conspirators.  *See, e.g., U.S. v. Bestway Disposal Corp.*, 724 F. Supp. 62 (W.D.N.Y. 1989) (acquitting antitrust defendants based upon the evidence of competition; competition evidence impeached contrary government cooperator testimony). Second, the only antitrust case cited by the Antitrust Division to support its claim that competition is legally immaterial to an antitrust prosecution, *U.S. v. Andreas*, 216 F.3d 645 (7th Cir. 2000), did not mention *Brady*, and did not so hold.  *Id*. at 669 (affirming refusal to give defense theory instruction because instructions given covered intent legal defense that defendants were misleading competitors rather than colluding).  One would think that, on a matter so central to the trial obligations of the Antitrust Division, this case would not be the first outing of a Government claim that competition is legally immaterial to an antitrust prosecution.

Equally unresponsive is the Government's suggestion that the defendant should know of Crowley's competition, and therefore should himself undertake to identify competition evidence. Dkt. No. 97, at 6.  *See, e.g.*, *Howell*, 231 F.3d at 625 (Trott, J.) ("'defense counsel is entitled to plan his trial strategy on the basis of full disclosure by the government regardless of the defendant's

knowledge or memory of the disclosed statements'") (quoting *U.S. v. McElroy*, 697 F.2d 459, 465 (2d Cir. 1982)).

The competition evidence in this case is uniquely in the possession and control of the Government and its cooperating carriers Horizon and Sea Star.  According to the Government (and its Indictment) Horizon and Sea Star are the carriers who should have been competing with Crowley, but were not.  In addition to admitting that it refuses, on principle, to search through the Horizon and Sea Star documents it possesses for evidence of their competing against Crowley, the Government admits that it hasn't even exercised its control over these carrier's unproduced records to search for such evidence of their competition.

On the merits, the Government is simply wrong as a matter of law—evidence of competition both contradicts an accusation of non-competition and it impeaches the government witnesses who claim collusion when they are in fact competing. These two fundamental but independent grounds of *Brady* materiality (impeaching a government accusation and impeaching government-sponsored accusers) were made crystal clear by the First Circuit in *U.S. v. Aviles-Colon*, 536 F.3d 1 (1st Cir. 2008).   In *Aviles-Colon*, the government claimed that a defendant was a member of a drug conspiracy as supported by the testimony of its cooperating witnesses.  *Id.* at 20-21.   During a later trial, the government disclosed DEA reports from confidential witnesses indicating that the defendant was a member of a rival drug conspiracy, and that his conspiracy was "at war" with the drug conspiracy in which the government and its cooperating witnesses had placed defendant.  *Id.* These undisclosed reports of membership in a rival conspiracy were material under *Brady* because they both undermined the government's conspiracy accusation and the testimony of the government's cooperating witnesses.  *Id.* at 21 (reports supports defendant's denial of conspiracy membership and impeaches government's witnesses).  If facts suggesting a rivalry between two drug

conspiracies are sufficiently material to satisfy *Brady*, then the existence of ongoing competition between alleged colluders constitutes *Brady* material in an antitrust case.

**V.     The Complete Cooperation Agreements Should Be Produced.**

Here, the Government has acknowledged that it has withheld from the defense material related to the cooperation agreements of Horizon and Sea Star, and has indicated it would produce such material to the defense but for its understanding that this information cannot be disclosed under the practices of this Court.  Specifically, the Government produced the plea agreements of Horizon and Sea Star but admits that it has withheld from the defense the Supplemental Plea Agreements of Horizon and Sea Star, including Exhibits A, B, and C thereto, which it confirms address the cooperation agreements undertaken by those carriers.

The facts and circumstances of cooperation agreements are material, discoverable, and exculpatory under both *Brady* and Rule 16.  *Pesaturo*, 519 F.Supp.2d at 191 ("The informant's cooperation agreement (as well as any promises, rewards or inducements made to him) are exculpatory under *Brady* and material to the preparation of the Defendant's defense within the meaning of Rule 16.").  *See also Giglio*, 405 U.S. 150 (promises of leniency constitute *Brady* material).  This and any similar material relating to the cooperation undertakings of these two carriers should be disclosed under *Brady*.

**Conclusion**

For the foregoing reasons, this Court should grant this motion to compel and order both production of responsive information and documents and an evidentiary hearing into the integrity of spoliated documents.

Respectfully submitted,

Dated: June 3, 2014

By*: /s/*  Terrance G. Reed_____
By: /s/ _V. Thomas Lankford__
Terrance G. Reed (Pro Hac Vice)
V. Thomas Lankford (Pro Hac Vice)
Lankford & Reed, PLLC
120 N. St. Asaph Street
Alexandria, VA  22314
(Phone) 703-299-5000
(Facsimile) 703-299-8876
tgreed@lrfirm.net
vtlankford@lrfirm.net

By: /s/ _Mark Rosenblum_____
Mark Rosenblum (Pro Hac Vice)
Mark Rosenblum, P.A.
1300 Riverplace Boulevard, Suite 601
Jacksonville, FL 32207
(Phone) 904-396-6100
(Facsimile) 904-346-4481
mark@markrosenblumlaw.com

By: /s/ _Joseph C. Laws_____
Joseph C. Laws (USDC-PR Bar No. 120306)
239 Arterial Hostos Avenue, Suite 402
San Juan, PR 00918
(Phone) 787-754-7777
(Facsimile) 787-763-5223
lawofficesofjosephlaws@gmail.com

*Counsel for Defendant Thomas Farmer*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on the 3rd day of June, 2014, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following:

Craig Y. Lee, PR Attorney #G01208
Jon B. Jacobs, PR Attorney #G01508
Trial Attorneys
U.S. Department of Justice
Antitrust Division
National Criminal Enforcement Section
450 5th St., NW Suite 11300
Washington, DC 20530
Tel: (202) 307-6694
Fax: (202) 514-6525
Email: jon.jacobs@usdoj.gov

By: /s/ Terrance G. Reed (Pro Hac Vice)
LANKFORD & REED, PLLC
120 N. St. Asaph Street
Alexandria, VA  22314
(Phone) 703-299-5000
(Facsimile) 703-299-8876
tgreed@lrfirm.net